UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY VAN POPERIN and
EUGENE N. HARGRAVE,

      Plaintiffs,

vs.                                                                      Case No. 10-11110

HEWLETT-PACKARD COMPANY,                             HON. AVERN COHN
a corporation,

      Defendant.

_____/

**MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Doc. 34) AND DISMISSING CASE**

**I.  INTRODUCTION**

This is an employment age discrimination case under the Age Discrimination Act

(ADEA), 29 U.S.C. § 621, *et seq.* and Michigan's Elliot Larson Civil Rights Act (ELCRA),

Mich. Comp. Laws § 37.2201, *et seq.*  Plaintiffs Gary Van Poperin (Van Poperin) and

Eugene N. Hargrave (Hargrave) (collectively, Plaintiffs) were both employees of Defendant

Hewlett-Packard Company (HP) for over thirty years until they were terminated in early

2009.  HP contends that Plaintiffs were terminated as a result of work force reductions

geared towards eliminating redundancies, reducing costs, and increasing productivity in the

workforce.  Plaintiffs say that, in reducing the workforce, HP used a forced ranking

employee evaluation system inherently discriminatory against older employees.[1]  The first

_____

[1] In other words, Plaintiffs say that, after managers assessed the employees, individual
employees were compared to each other and ranked.  As will be explained below, Van
Poperin provided testimony of a statistical analyst who opined that the "ranked" score

amended complaint is in four counts, phrased by Plaintiffs as follows:

Count I          Violation of ADEA – Disparate Treatment

Count II         Violation of Elliot-Larson Civil Rights Act – Disparate Treatment

Count III        Violation of ADEA – Disparate Impact

Count IV        Violation of ELCRA – Disparate Impact

Now before the Court is Defendant's motion for summary judgment (Doc. 34) on the grounds that there are no genuine issues of material fact that Plaintiffs were terminated because of workplace reductions and not because of their age. For the reasons that follow, the motion is GRANTED. This case is DISMISSED. Each Plaintiffs' case is considered separately below.

## II. BACKGROUND

### A. Defendant's Acquisition of Electronic Data Systems

In 1984, General Motors Company (GM) purchased Electronic Data Systems (EDS). EDS was part of GM until 1996 when it was converted to an independent and separate company, still associated with GM. In 2008, EDS was acquired by HP. As is described by HP's Human Resources Business Consultant, "HP maintains world-wide operations offering technology solutions to consumers, businesses, government agencies, and schools. HP's offerings span hardware, software, IT infrastructure and other services." (Doc. 35-2 at 2, Olson Decl.).

------------------------

assigned to an employee in Van Poperin's division correlated to the employee's age. According to the analyst, the ranking was discriminatory to older employees. Hargrave did not provide similar evidence relating to the division he worked in.

2

**B. Plaintiffs' Employment and Discharge**

    **1. Hargrave**

Hargrave began his employment with GM in 1969 at GM's Norwood plant in Ohio. He worked as a computer operator, lead programmer, and operations team leader until he was transferred in 1971 to GM's Detroit Assembly Plant, where he became "IT lead." Hargrave eventually became a senior programmer, and he continued in that position until becoming a manager at EDS.  From 1996 forward, Hargrave worked as an account manager,  business consultant for engineering, delivery manager, and business planning consultant for GM's Online Unit.  Hargrave continued working as a business planning consultant when EDS was acquired by HP.  He was terminated on March 27, 2009 at the age of 61.

    **2. Van Poperin**

Van Poperin began working for GM in 1978 as a communications analyst.  After two years in this position, Van Poperin worked as a human resources representative until GM acquired EDS.  After GM's acquisition of EDS, Van Poperin became a part of the IT research and development group at EDS.  Van Poperin held multiple positions at EDS, including supporting GM Powertrain, engineering manager, subject matter expert, bid manager, senior consultant, and senior business analyst.  He continued as a senior business analyst when HP acquired EDS.  Van Poperin was terminated on January 30, 2009 at the age of 61.

**C. The Workforce Reductions**

After HP acquired EDS in 2008, "the Company assessed its overall business needs and productivity, and determined that there were redundant employees across its various

3

business units." (Doc. 52 at 2, Combined Statement of Facts). As a result, HP "made the decision to engage in various work force reductions ("WFRs") to eliminate redundancies, reduce costs and increase productivity." (*Id.*).

To implement staff reduction, the upper management first identified the functions that were no longer needed, i.e. the redundant functions that HP's clients were not paying for. (Doc. 35-4 at 9, Lavan Dep.). The employees who were performing the unnecessary functions were put into the WFR pool and were assessed by their skills. (*Id.*). To do this, managers filled out "slate" sheets (i.e. spreadsheets containing employee assessments in different categories), which were then consolidated by the human resources department. From these management assessments, it was determined which employees would be terminated as part of the WFRs.[2]

The employees selected for termination were given 60 days to find other available positions at HP that they were qualified for. If at the end of the 60 days, the employee could not find another position, the employee was terminated.

HP determined that reductions were necessary in the ESM Unit and the GM Online Unit.

---

[2] According to Plaintiffs, the WFRs affected HP's direct hires and those employees who were hired under a workforce agreement (WFA). Employees hired under a WFA do not work directly for HP. Instead, they work for a third party–the "owning" organization. HP disagrees with Plaintiffs and contends that WFA employees were not affected by the WFRs. HP says that only direct hires were selected in the WFRs and subject to termination. As for WFA employees, HP says that it could eliminate the work being performed by the WFA employee, cancel the WFA, and return the WFA employee to his or her owning organization, but it could not terminate the employee. This distinction is not determinative of Plaintiffs' claims and, therefore, is not important.

**1. The ESM Business Unit WFR (Van Poperin)**

In Van Poperin's capacity as a senior business analyst, he worked for HP's Enterprise Services Management (ESM) Business Unit (the ESM Unit), and was a member of the 30-employee transition team at the time of EDS's acquisition by HP.  At the time of Van Poperin's employment at HP, the organizational structure of the leadership in the ESM Unit transition team was as follows:

| | |
|---|---|
| Director and Vice President: | Bernard Mamon |
| Americas team manager: | Ola Chowning |
| Europe/Mid-East/Africa team: | Rao Tilak |
| Demand area manager: | Tom Garbett |
| Project management: | Mike Benedict |

Van Poperin was a member of the Americas team and reported directly to Chowning.

To implement a 10% reduction in the ESM Unit, Mamon instructed the service transition team managers–Chowning, Benedict, Garbett, and Tilak–to assess employees and submit their recommendations to him as to which employees should be terminated as part of the WFR.  Specifically, Mamon's instructions to the transition team managers required that a total of three of the transition team's "30 or so" employees be terminated. (Doc. 35-8 at 9, Chowning Dep.).

Mamon explained at his deposition the process that was followed in determining which employees to recommend for termination:

> So we took a standard approach across the environment where we actually grouped all employees, we ranked all employees.  We grouped all employees within a specific organization and function and then we grouped them within that function.
>
> Then I actually had – I held I believe it was at least two reviews where I had all the

5

leaders come in and discuss their bottom 25 percent of their organization as they performed all the grouping and rankings. I did a comparison of specific jobs and functions across the organizations to see if there was [sic] opportunities for somebody who may have got ranked lower in one part of the organization and was more qualified in another part of the organization.

I went around the table and I had every [manager] describe their employee, what their strengths were, what their weaknesses were, why they were ranked that way. I asked all of the other leaders around the table to provide what other input they may have related to that employee, if they worked with them in the past, if they worked with them currently, did they understand their capabilities? Some people had more dialogue than others.

We did move people as appropriate from one part of the organization to the other part of the organization based on their competencies. We really wanted to retain the best individuals for the new way we were going to have to align our work and run our business.

And I held at least two reviews like that where we had questions and we had to ask the leaders to go back and do additional information.

My HR department went through and made sure all of them filled out worksheets and how they would rank the individuals, and we followed and used standard templates as far as how we filled them out related to the overall workforce activity.

(Doc. 35-7 at 8).

To determine which employees to recommend for termination, team managers evaluated the employees in two different competency categories, each category providing for a score of one to five points. The lowest ranked employees were selected for termination. The first category evaluated was "JOB SPECIFIC Competencies/Skills: The job specific technical competencies/skills that will be required to achieve future results." The second category evaluated was "HP Leadership Competencies: The selection competencies/skills associated with how the future results will be achieved." As described in the combined statement of facts, "[a]fter each manager made his/her selections, they entered the competency assessment score for each direct report into an Excel spreadsheet

6

– called a 'slate' – . . . , indicating which employees had been selected for termination as part of the WFR and which employees would be retained." (Doc. 52 at 5). These categories were further defined in a "Competency Definition Form." (Doc. 35-13 at 2).

Chowning explained:

There are – in EDS they had two sets of competencies. One that was applied to all employees, I believe it was called leadership competencies, there were then a second set of competencies that were related to the actual role of the employee. And what you basically did was for each employee separately and individually, you rated them on each of those competencies on a scale. I believe it was one to five. And so you rated them on each of the competencies, which gave them a total score, and then you took the total scores of each of the individuals and sorted them basically, and that's what gave you the actual ranking of the individuals.

You – when you did that, obviously, because you would typically be using whole numbers, you would have individuals who had the same number. So you had to assess individuals as a group against each other, basically, to kind of assess whether you thought one individual was better than another individual –

(Doc. 35-8 at 7).

Chowning's slate sheet (Doc. 35-11 at 2) shows that she assessed Van Poperin as follows:

| Name | Job-Specific Competencies | HP Leadership Competencies |
|------|---------------------------|----------------------------|
| Van Poperin | 3 | 2 |

Because he received the lowest assessment out of the twelve direct reports Chowning assessed, she marked Van Poperin as "selected for the WFR."

After the managers of the separate teams met as a group with Mamon to propose individuals for inclusion to the WFR, they decided that the team leaders would work together to come up with an overall assessment/ranking. In other words, in addition to the individual assessments the managers had already completed for their direct reporting

7

employees, each manager would assess each individual employee that he or she had experience working with, regardless of who that employee reported to.

Chowning explained at her deposition:

So we said, let's just sit down and everyone take the entire list because we knew all of the people. We'd worked with most of the people, whether they were in my process team or in Tom's demand team or in Mike's project management team. We had worked, you know, across the teams, and so we decided that all of us would rate all of the employees that we knew and come back together and discuss – you know, discuss those ratings.

(Doc. 35-8 at 10, Chowning Dep.).

Thus, all of the managers ranked all of the direct report and WFA employees, *see* (Doc. 35-14 at 2; Combined Assessment/Ranking). Chowning then created an average "ranked" score for the employees, essentially ranking the employees against each other.

Chowning explained at her deposition how she reached her average ranked score:

Q.    Okay. So once you performed the ranking and everyone put their numbers together, how is it that you made your selections?

A.    The first thing that I did is I took all four rankings from the four leaders and I created an average.

Q.    Okay.

A.    And then we sorted the list by the average.

Q.    Okay.

A.    Highest to lowest because we had all ranked one to five, and then we talked about the lower quarter or so portion of the list. So we looked at the list kind of from the bottom up, lowest ranked individuals up. And we just talked about each individual and why did you rank them this or why didn't you rank them at all because there were cases where they weren't ranked, to determine if there was someone who had fallen to the bottom inaccurately. We looked at the people on the top as well just to make sure that there wasn't somewhere there that, you know, one of the four of us would say, Wait, why is that person way up there on the list. But we generally talked about probably the bottom ten or so.

> While we'd been given a number, there was always the chance that they would change the number on us, so we wanted to make sure that we didn't just say, it's these two or these three people, but that we were prepared for if it was a little more than that.

(Doc. 35-8 at 12, Chowning Dep.).

Van Poperin was ranked by the different managers as follows:

Chowning     2

Garbett       2

Tilak          2.5

Benedict     no rating

During the meetings with Chowning, Benedict, Garbett, Tilak, and Mamon, the managers discussed Van Poperin's prior work for ESM client Ahold in 2007. (Doc. 52 at 8). Ahold had complained about the level of service provided by Van Poperin and was unhappy with EDS in general.

Ultimately, Van Poperin and Tina Alcorn (Alcorn), age 52, were selected for termination, having received the lowest average assessments by the managers.[3]   In addition, Defendant ended the workforce agreement for Rao Vidya, a WFA employee, meaning that Vidya was sent back to his "owning" organization.

Dr. David A. Macpherson, Van Poperin's expert witness, performed a statistical analysis of the selection process in the ESM Unit WFR. Macpherson determined that the selection into the WFR was disproportionally higher for older employees.

---

[3] Van Poperin says he was selected for termination after Chowning's first assessment and that any subsequent meetings/rankings were meaningless. This, however, undermines Van Poperin's reliance on the statistical analysis below. The statistical analysis deals in part with the difference in scoring between Chowning's original assessment and final rankings.

First, Macpherson analyzed the data relating to the twelve employees, including Van Poperin, rated by Chowning.[4]  Macpherson concluded that the gap between Chowning's overall rating and the average of the job-specific competencies/skills and HP leadership competencies ratings was indicative of differential treatment for "older" employees.

Macpherson used an age of "47 and younger" as the cutoff between "younger" and "older" employees.  Macpherson explained:

> For the five workers aged 47 and younger, the average gap between her rating and the average of the job-specific competencies/skills and HP leadership competencies ratings was 0.0.  The largest ratings difference for this age group was 0.1.  For the seven workers older than age 47, the average difference between Ms. Ola Chowning's rating and the average of the job-specific competencies/skills and HP leadership competencies ratings was -0.3.  The largest ratings difference for this age group is -0.6.  The key statistical question revolves around whether the difference in ratings gaps between the age groups (0.0 for those age 47 and younger and -0.3 for those older than age 47) is statistically significant.

> A t-test indicates that the -0.3 difference in ratings gap between the age groups is statistically significant since, at 2.78 standard deviations, it is greater than the 2 standard deviations threshold previously discussed.  Differences of this magnitude are not likely to occur by chance alone.  The odds of this difference being due to chance alone are 1 in 184.

(Doc. 38-7 at 6).

Second, Macpherson analyzed the data relating to those selected for inclusion in the ESM Unit WFR.  Macpherson explained:

> The second analysis, shown in Table 2 of Appendix B, examines selections for WFR in the ESM unit of HP.  It defines older workers as those employees aged 58 and older as of the selection date of November 7, 2008.  On this date, 25 employees

---

[4] The data Macpherson relies on contains four employees who are not on Chowning's slate sheet.  Macpherson's report lists Todd Francisco, age 39; Mike Davidson, age 47; Blair Spring, age 50; and Kim Grusenmeyer, age 52.  The report omits Tina Alcorn, age 52; Carl McGlashan, age 56; Blair Spring, age 51; and Lisa Wendt, age 42.  The employees included on Macpherson's list are included in the managers' combined slate sheet.

who held a job in the ESM unit of HP were selected from an overall group of 258 workers at ESM unit of HP who could have been selected (e.g. were "at risk" for selection).  Since about 9.3% of the at-risk employees were age 58 and over as of this date (e.g. 24 of 258), we would expect that about 2.3 of the selected employees (e.g. 9.3% * 258 = 2.3) to be older workers, defined as that age 58 and over.

The data indicate that 6 of the selected employees were age 58 and over, a number greater by 3.7 employees than would have been expected if the age distribution of the selected workers exactly equaled the age distribution of the pool from which they were selected (e.g. 6 – 2.3 = 3.7). . . .

The analysis indicates that this 3.7 employee difference is statistically significant since, at 2.66 standard deviations, it is greater than the 2 standard deviations threshold previously discussed.  The odds of this difference being due to chance alone are 1 in 128.

(*Id.* at 7).[5]

### 2. The GM Online WFR (Hargrave)

As explained in the combined statement of facts (Doc. 52), "GM Online was the largest business unit supporting the GM account and was also EDS's biggest client." (Doc. 52 at 15).  The business office group, which Hargrave was a part of, was supervised by Susan Cencioni (Cencioni).  Hargrave reported to Cencioni and he was a "business planning consultant."  (Doc. 35-19 at 9, Hargrave Dep.).

In the fall of 2008, Eugene O'Callahan, Vice President of Defendant's GM Online Unit, decided to reduce employees as a way to reduce costs.  To that end, O'Callahan instructed the managers of the different divisions of the GM Online Unit to assess employees and determine which employees should be terminated.  O'Callahan provided the managers with a target number for reducing employees.

A similar process was followed when assessing GM Online Unit employees as was

---

[5] The data Macpherson relies on is not attached to his report.

11

used when reducing employees in the ESM Business Unit.  The managers assessed each employee, met as a group with O'Callahan, and recommended employees for termination.

Cencioni evaluated the nineteen employees in the business office group.  Cencioni's slate sheet (Doc. 35-28 at 2) shows that she assessed Hargrave as follows:

| Name | Job-Specific Competencies | HP Leadership Competencies |
| --- | --- | --- |
| Hargrave | 3 | 4 |

Because Hargrave's competency assessment total of 7 was the second lowest, and because it was also determined that Hargrave had a significantly diminished workload, he was selected for termination.  In addition to Hargrave, Donna Dunlap, age 50, was terminated because she had the lowest competency assessment total–6.  Like HP did with Hargrave, it determined that the work Dunlap was performing was no longer necessary.

After Hargrave was terminated, his remaining tasks were assumed by Hana Moudallal and Dolly Batra, who also worked in the GM Online Unit.  (Doc. 52 at 18–19). Moudallal was 42 and Batra was 51.

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The revised Rule also provides the consequences of failing to properly support or address a fact:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

13

## IV. DISCUSSION

### A. Disparate Treatment Claims (Counts I and II)

#### 1. The Law

The ADEA "prohibits employers from discharging employees forty years of age or older on the basis of age." *McKinley v. Skyline Chili, Inc.*, ___ F. App'x ___, 2013 WL 4436537, at *3 (6th Cir. 2013) (citing 29 U.S.C. §623(a)). "ELCRA claims are analyzed under the same standards as federal ADEA claims." *Gieger v. Tower Automotive*, 579 F.3d 614, 626 (6th Cir. 2009) (citation omitted); *see also Meager v. Wayne State Univ.*, 222 Mich. App. 700, 709 (1997).

As the Sixth Circuit has explained, "[a] plaintiff who brings an age-discrimination claim based on a disparate-treatment theory 'must prove that age was a determining factor in the adverse employment action that the employer took against him.'" *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (citing *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). Discrimination based on age can be proven by direct or circumstantial evidence. *McKinley*, 2013 WL 4436537, at *3. Direct evidence of age discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Allen*, 545 F.3d at 394 (citation omitted). "'Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred.'" *Id.* (citation omitted).

Where the plaintiff relies on circumstantial evidence to prove age discrimination, the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.

14

*Id.* (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998)). Under *McDonnell Douglas*, the plaintiff must first establish his prima facie case.  To establish a prima facie case of age discrimination, the plaintiff must "'show that 1) she was a member of the protected class, 2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was replaced by someone outside the protected class.'" *McKinley*, 2013 WL 4436537, at *3 (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)).

However, where workforce reduction is involved, the fourth element is modified.  In workforce reduction cases, a plaintiff "does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (citations omitted).  As the Sixth Circuit explained in *Barnes*, "[i]f the plaintiff was truly singled out for discharge because of age he or she should be able to develop enough evidence through the discovery process or otherwise to establish a prima facie case." *Id.* at 1465–66; *see also Reminder v. Roadway Exp., Inc.*, 215 F. App'x 481, 483 (6th Cir. 2007) (explaining that in a reduction-in-force case, the framework is modified requiring "additional direct, circumstantial, or statistical evidence. . . .") (citation and internal quotation marks omitted).

If the plaintiff establishes a prima facie case, the burden shifts to defendant to show a nondiscriminatory rationale for its actions. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001)).  If the defendant succeeds in showing a nondiscriminatory rationale, the burden shifts back to the plaintiff to show that the defendant intentionally discriminated against him

15

and its stated reasons are pretext for discrimination. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citations omitted). "A plaintiff can demonstrate that an employer's proffered reasons are pretext for unlawful discrimination by showing that the reasons (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) were insufficient to motivate the employment action." *McKinley*, 2013 WL 4436537, at *4 (citations omitted).

### 2. Analysis

HP argues that each Plaintiff fails to establish a genuine issue of material fact that he was intentionally discriminated against because of his age and therefore has not established a prima facie case. Alternatively, HP argues that each Plaintiff has failed to show that HP's proffered explanation for his termination–the WFRs–was pretext for age discrimination. The Court agrees.

#### i. Hargrave

Hargrave has not proffered any direct evidence of age discrimination. Hargrave relies on circumstantial evidence to prove his case and, therefore, the Court will apply the *McDonnell Douglas* burden shifting framework explained above.

Under the first step of *McDonnell Douglas*, Hargrave must proffer sufficient evidence to establish a prima facie case of age discrimination. He has failed to do so.

The only element in dispute is whether Hargrave was singled out for termination because of his age. Hargrave contends that the fact that he was terminated while HP at the same time retained Moudallal– who is twenty years younger than him– is circumstantial evidence sufficient to show that the decision to terminate him was based on his age. This is the only evidence Hargrave proffers in support of his claim. Because this is insufficient

16

to establish a prima facie case in the context of workforce reduction cases, Hargrave argues that his case is not a traditional workforce reduction case, but instead is more akin to a hiring or promotion case.  Hargrave is wrong.

The Sixth Circuit in *Barnes* stated:

It is important to clarify what constitutes a true work force reduction case.  A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.  An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.  However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d at 1465; *see also Geiger v. Tower Automotive*, 579 F.3d 614, 623 (6th Cir. 2009);

*Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 265 (6th Cir. 2010).

Here, HP did not hire another worker to replace Hargrave.  Instead, his position was eliminated and the tasks he was performing were assumed by Moudallal.  Thus, Hargrave's argument that he was more qualified than Moudallal is insufficient to establish a prima facie case of age discrimination.  Indeed, the Sixth Circuit rejected this very argument in workforce reduction cases:

We do not believe the same rationale applies to a work force reduction where the plaintiff has done no more than show the elements of the *McDonnell Douglas* formula that relate to his or her situation: (1) that he or she was age forty or over; (2) that he or she was qualified to perform the job; and (3) that he or she was discharged.  When work force reductions by the employer are a factor in the decision, "the most common legitimate reasons" for the discharge are the work force reductions.  By showing the other elements of a *McDonnell Douglas* case, a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. *LaGrant v. Gulf and Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984) ("[t]he mere termination of a component employee when an employer is making cutbacks

17

due to economic necessity is insufficient to establish a prima facie case of age discrimination"); *McMahon v. Libbey-Owens-Ford Co.*, 870 F.2d 1073 (6th Cir. 1989); *Sahadi v. Reynolds Chemical*, 636 F.2d 1116, 1118 (6th Cir. 1980).

> **Our conclusion would not change even if a plaintiff additionally demonstrated that younger persons were retained in other jobs which the plaintiff was qualified to perform. A different result would allow every person age 40-and-over to establish a prima facie case of age discrimination if he or she was discharged as part of a work force reduction.** *Sahadi*, 636 F.2d at 1118.

*Barnes*, 896 F.2d at 1464–65 (emphasis added).

Thus, based on *Barnes*, Hargrave has failed to proffer sufficient evidence establishing a prima facie case of age discrimination. Said differently, Hargrave has not proffered a single piece of evidence showing that he was terminated for anything other than HP's decision to reduce the workforce. Accordingly, HP is entitled to summary judgment on Hargrave's disparate treatment claims.[6]

### ii. Van Poperin

Like Hargrave, Van Poperin does not offer any direct evidence of age discrimination. Thus, the *McDonnell Douglas* burden shifting framework also applies to Van Poperin's claims. The Court therefore begins its analysis by determining whether Van Poperin has established a prima facie case of age discrimination based on circumstantial evidence.

Unlike Hargrave, Van Poperin relies on Macpherson's statistical analysis of the WFR in the ESM Unit to argue that the patterns of selections in the WFR are indicative of age discrimination. As the Sixth Circuit explained in *Barnes*, "[a]ppropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if

---

[6] If the Court were to find that Hargrave established a prima facie case, it would ultimately determine that he failed to proffer evidence showing that HP's nondiscriminatory reason for terminating him–the WFR–was pretext for age discrimination.

unrebutted, create an inference that a defendant discriminated against individual members of the class." 896 F.2d at 1466 (citations omitted). However, "[t]o do so, the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity. *Id.* (citation omitted).

Macpherson's statistical analysis reaches two conclusions. First, Macpherson analyzed the differences in Chowning's assessment values of employees, including Van Poperin, and the "average" rating assigned by Chowning. Macpherson concluded that Chowning averaged employees 47 and older differently and more negatively than employees who were 46 and younger. The odds of the disparity being a result of chance alone, according to Macpherson, is 1 in 184. Second, Macpherson analyzed the 25 out of 258 employees in the ESM Unit selected in the WFR. The analysis revealed that employees age 58 and over represented a disproportionate number of employees making up the WFR. Macpherson stated that the odds of this being a result of chance alone are 1 in 128.

Macpherson's statistical analysis, when viewed in a light most favorable to Van Poperin, is sufficient to establish a prima facie case of age discrimination. Indeed, "[s]ince it is reasonable to presume at this stage of the case that skill is distributed randomly over any given age group and since [Van Poperin] ha[s] shown that the results depart significantly from those that chance alone would predict . . . , the statistics, on their face, establish a prima facie case of discrimination." *Barnes*, 896 F.2d at 1466.[7]

---

[7] The Court reaches this conclusion bearing in mind that the evidence must be viewed in a light most favorable to Van Poperin and all inferences must be drawn in his favor. Thus, although the accuracy and reliability of Macpherson's report is challenged by HP, it is enough to establish a prima facie case.

This, however, does not end the Court's analysis. HP has offered a nondiscriminatory reason for terminating Van Poperin: he was terminated because the company had to make certain workforce reductions. Thus, Van Poperin must establish that HP's proffered reason for terminating him was pretext for age discrimination. To establish pretext, Van Poperin again relies solely on Macpherson's statistical analysis. His reliance on the statistical analysis, however, is insufficient to show pretext.

In *Barnes*, the Sixth Circuit explained that there are three possible explanations when a plaintiff's statistics indicate a disproportionate discharge rate: (1) legitimate selection criteria; (2) chance; or (3) the defendant's bias. 896 F.2d at 1468. Thus, where "a plaintiff demonstrates a significant statistical disparity in the discharge rate, he or she has provided strong evidence that chance alone is not the cause of the discharge pattern." *Id.* at 1469. Although this is enough to establish a prima facie case without providing additional evidence that bias is the more likely cause of discharge, there are several ways that a defendant employer can attack a prima facie case established by statistics. *Id.*

One way to attack statistics that indicate bias against older employees is to show that the particular decision to discharge the plaintiff was justified. *Barnes*, 896 F.2d at 1469. Here, HP proffered evidence explaining why Van Poperin was assessed lower than other employees. Specifically, during the management meetings, it was discussed that HP had received negative feedback about Van Poperin in the past from HP's client, Ahold. Ahold "was having issues with multiple areas of EDS services including the services that Mr. Van Poperin was delivering through the account." (Doc. 35-7 at 18, Mamon Dep.). When asked to describe Van Poperin in terms of his work performance, Mamon stated:

I would reiterate the statements that were communicated to me about his ability to

work with the [Ahold] account, his ability to get the positive results out at the account.  There were on multiple occasions where, you know, it was stated his whereabouts or his availability trying to get ahold [sic] of him.  I would state that they went through and did an evaluation talking about what a senior individual should be doing and how they should be performing and he was not delivering at those capabilities.  I do not have all the exact examples.  I can tell you that even on the last day when we did the separation, on the last day when we did the separation we had difficulty tracking down Gary.

(*Id.* at 23).

    In addition, Chowning explained:

A.    I had, of course, over the three-month period not only engaged directly with Mr. Van Poperin but also with the people that he was there to support, the account leadership, the leadership of the region that he was supporting, and what he was doing with the account that he was working on.  And I had several conversations around his performance.

Q.    With whom?

A.    So I remember distinctly a conversation with the hub service person.  Her name was Ellen Giasi, G-i-a-s-i, I believe, who was responsible for service delivery of the account that Gary was on and had been on for sometime.  As I recall, it was over a year, which is an extremely long period of time.  And I had, prior to the WFR, needed additional process people on new accounts and so had approached Ellen to say, I need Gary back. . . .

    And her response was, We don't really want Gary.  He hasn't been very effective, and, you know, he's had some issues with his temper.

(Doc. 35-8 at 15, Chowning Dep.).

    Because HP has pointed to evidence establishing a specific explanation of why Van Poperin was assessed lower than other employees in connection with the WFR, he cannot rely solely on the statistical analysis to show pretext.  Indeed, Van Poperin must "show that [HP's] explanations are inherently suspect or [he] can present other direct or circumstantial evidence suggesting that the proffered reasons are not true."  *Barnes*, 896 F.2d at 1469.  Van Poperin has failed to do so.  Van Poperin has not proffered any evidence to show that

21

HP's explanation that past complaints about his work performance, as well as complaints about his work ethic, were false.  In fact, after he was selected for termination, Van Poperin wrote a letter to the CEO of HP and specifically acknowledged the troubles with Ahold.[8] Because Van Poperin relies solely on the statistical analysis which is insufficient to rebut HP's particular explanation why Van Poperin was assessed the way he was, HP is entitled to summary judgment.

## B. Disparate Impact Claims (Counts III and IV) (Van Poperin only)[9]

### 1. The Law

Unlike a claim of disparate treatment which requires a showing of intent to discriminate, a claim of disparate impact involves a facially neutral employment practice which nonetheless impacts a protected group more harshly than other non-protected individuals.  *Allen v. Highlands Hospital Corp.*, 545 F.3d 387, 403 (6th Cir. 2008).  To establish a prima facie case of disparate impact, a plaintiff must "identify a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[] that the challenged practice has an adverse impact on a protected group."  *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005).  A plaintiff must do more than point to a

---

[8] Even if Van Poperin has an explanation as to why Ahold complained about him–because Ahold complained about EDS in general–he has failed to show that management did not discuss his work for Ahold and take it into consideration in deciding how to assess him.  The managers' reliance on the past complaints from Ahold are protected by the "honest belief" rule, which shields HP's reasonable reliance "on particularized facts that were before it at the time the decision was made."  *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (citation omitted).

[9] As a preliminary matter, Hargrave failed to proffer any evidence or make any argument relating to the disparate impact claims.  Thus, HP is entitled to summary judgment against Hargrave on this basis alone.  The disparate impact claims are analyzed only as it relates to Van Poperin.

generalized policy. *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir. 2008) (citation omitted). "[T]he plaintiff must 'isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Id.* (citations omitted).

Where plaintiffs show a disparate impact by the use of statistics, "courts must be careful to evaluate the proffered statistical analyses in light of the total circumstances in a given case." *Shollenbarger*, 297 F. App'x at 485 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339–40 (1977)). Indeed, "[i]ncomplete or inapplicable analyses, simplistic percentage comparisons, and small sample sizes produce statistical analyses with little probative value." *Id.* (citations omitted).

After the plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate and demonstrate a legitimate business justification for the challenged practice." *Id.* at 485 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i). If the employer meets this burden, the burden shifts back to the plaintiff to show that "'other tests or selection devises, without a similarly undesirable . . . effect, would also serve the employer's legitimate [business] interest[s].'" *Id.* (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988) (brackets in original)). The purpose of the last step "is not to second guess the employer's business decisions, it is to show–by pointing to obviously ignored alternatives–that the 'particular employment practice' was actually pretext for discrimination." *Id.* at 487 (citation omitted).

### 2. Analysis

Here, Van Poperin has not established a prima facie case of disparate impact under the ADEA and ELCRA. Van Poperin relies on a simplistic statistical analysis without

pointing to any WFR policy responsible for the purported disparaties.  Van Poperin's general argument that HP relied on subjective assessments fails to show a "specific employment practice" that led to the disparity.

Even assuming that Van Poperin could establish a prima facie case, HP articulated a legitimate business justification for its WFRs.  As explained above, after HP acquired EDS in 2008, "the Company assessed its overall business needs and productivity, and determined that there were redundant employees across its various business units." (Doc. 52 at 2, Combined Statement of Facts).  As a result, HP "made the decision to engage in various work force reductions ("WFRs") to eliminate redundancies, reduce costs and increase productivity."  (*Id.*).

Because HP articulated a legitimate business justification for its WFRs, the burden shifts to Van Poperin to show that HP could have achieved its business purposes by means less discriminatory to older employees.  Van Poperin has not pointed to any "obviously ignored alternatives" to show that HP's WFRs were pretext for discrimination.  Accordingly, his disparate impact claims fail to survive HP's motion for summary judgment.

## V. CONCLUSION

For the reasons stated above, HP's motion was granted and this case was dismissed.

SO ORDERED.

 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  October 10, 2013

24

10-11110 VanPoperin, et al v.
Hewlett-Packard Company

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 10, 2013, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160